## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Chapter 11 |
| CIVIC PARTNERS SIOUX CITY, | ) | |
| LLC, | ) | |
|     Debtor. | ) | Bankruptcy No. 11-00829 |
| | ) | |

| | | |
|---|---|---|
| FIRST NATIONAL BANK, | ) | |
|     Plaintiff, | ) | Adversary No. 11-09046 |
| | ) | |
| v. | ) | |
| | ) | |
| CIVIC PARTNERS SIOUX | ) | |
| CITY, LLC, et al, | ) | |
|     Defendants. | ) | |
| | ) | |

| | |
|---|---|
| CIVIC PARTNERS SIOUX | ) |
| CITY, LLC, | ) |
|     Counter-Claimant, | ) |
| | ) |
| v. | ) |
| | ) |
| FIRST NATIONAL BANK, | ) |
|     Counter-Defendant. | ) |

### RULING ON THE MOTION FOR SUMMARY JUDGMENT BY FIRST NATIONAL BANK

This matter came before the Court on First National Bank's Motion for

Summary Judgment on Civic Partners Sioux City, LLC's counterclaim. The Court

held a hearing on the Motion on February 22, 2012. A. Frank Baron appeared for

the Debtor, Civic Partners Sioux City, LLC ("Civic").  G. Mark Rice and John

Moorlach appeared on behalf of First National Bank (the "Bank").  Peter Leo and

Lance Ehmcke appeared for the City of Sioux City, Iowa (the "City").  Richard

Jeffries appeared for Main Street Theatres, Inc. ("Main Street") and for William

Barstow, the owner of Main Street.  Donald Molstad and Robert Marticello

appeared for Steve Semingson, individually.  John Schmillen appeared for the U.S.

Trustee.  After hearing the arguments of the parties, the Court took the matters

under advisement—but deferred ruling for several of the reasons stated below.

This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (C).

## STATEMENT OF THE CASE

On December 7, 2010, First National Bank filed a Petition for Money

Judgment, Foreclosure of Real Estate Mortgage and Foreclosure of Security

Agreement against Civic in the Iowa District Court for Woodbury County (No.

EQCV143628).[1]  On January 5, 2011, Civic filed an answer and a counterclaim for

tortious interference with an existing contract.  Civic now also claims to have filed

a counterclaim for tortious interference with a prospective contract.  Civic filed a

voluntary Chapter 11 petition on April 14, 2011.  Civic immediately removed the

foreclosure action by the Bank to this Court.  On January 10, 2012, the Bank filed

a Motion for Summary Judgment on Civic's counterclaim.  Civic has resisted the

---

[1] Civic served its Answer and Counter-Claim on January 5, 2011.

2

Bank's Motion for Summary Judgment.  For the reasons that follow, the Court

grants in part and denies in part the Bank's Motion for Summary Judgment.

## FACTUAL BACKGROUND AND THE PARTIES' ARGUMENTS

Civic is the developer and owner of an entertainment and shopping complex

in Sioux City, Iowa.  The complex was to be an anchor in the redevelopment of an

area in Sioux City known as the Historic 4th Street Area.  Civic received its

primary financing for the facility from the Bank, which holds a first security

interest in the structure and some of the equipment.

The primary tenant of the complex is a 14-screen movie theater named Main

Street Theatres.  Only one of the other spaces in the facility is occupied by a

specialty shop.  Other banks—Liberty National Bank and Cass County Bank—and

the Small Business Administration also claim security interests in the property and

equipment.

Unfortunately, for a number of reasons, Main Street's theater was not as

successful as originally planned, and Main Street fell behind on the rent it owed to

Civic.  By 2009, Civic claimed Main Street owed a multi-million dollar deficiency.

Main Street had several arguments against Civic for offsets against some or all of

that rent.  Without Main Street's rent, Civic also fell behind on its payments to

First National Bank.  Civic has never made any payments to the City.

In August of 2009, the four principal parties, Civic, Main Street, First National Bank, and the City began mediation to attempt to find a solution which worked for all parties.  Civic, Main Street, and First National Bank reached a tentative agreement which they presented to the City.  The proposed mediation agreement outlined a global restructuring of the agreements and arrangements related to the project.  Under the proposed mediation agreement, Civic would forgive Main Street's deficiency on the rent and lower Main Street's monthly payments.  Main Street also agreed to release its claims and made a $200,000 restructuring payment to Civic.  Civic was also to receive a lower interest rate and other reductions from its lenders.  The proposed agreement was subject to the City's ratification by a vote of the Sioux City City Council.  The Sioux City City Council ultimately did not approve the agreement.

On December 7, 2010, the Bank filed a Petition for Money Judgment, Foreclosure of Real Estate Mortgage and Foreclosure of Security Agreement against Civic.  The Bank named several other junior interest holders as creditors in the foreclosure portion of its case.  Civic asserted counterclaims against the Bank. First, Civic contends the Bank tortiously interfered with its existing relationship with Main Street.  Civic contends the Bank before foreclosure had secretly negotiated a deal with Main Street to sell the building to Main Street after it foreclosed.  Civic claims the Bank offered to finance the purchase such that Main

4

Street's monthly payments would be less than those it owed Civic under its lease.

Civic argues that "deal" cut Civic out completely and made it impossible for Civic

to negotiate on new rent or back rent with Main Street.  Civic asserts this tortious

interference from the Bank stopped Main Street from dealing with Civic under the

existing lease arrangement—because Main Street already had a deal with the Bank.

Second, Civic now appears to also assert a claim that the Bank tortiously

interfered with its prospective business relationship with the City.  Civic argues

that the Bank's motivations in its discussions with the City after the tentative

mediation agreement were improper.  Civic contends that the Bank discouraged the

City from adopting the proposed mediation agreement involving Civic in favor of

the Bank's preferred solution which cut Civic out.  Civic contends the Bank's

motivations were improper and as such constituted an interference with its

prospective relationship with the City.  This claim does not appear specifically in

the answer and counterclaim.

## CONCLUSIONS OF LAW AND DISCUSSION

After filing bankruptcy, Civic removed the case to this Court on January 10,

2012.  The Bank filed a Motion for Summary Judgment on Civic's counterclaims

for tortious interference.  The Bank maintains that any discussions or negotiations

it had with Main Street do not qualify as actionable improper interference.  The

Bank also argues that its discussions and/or negotiations with Main Street were

fully authorized under the broad language in Civic's assignment of rents to the

Bank.  Finally, the Bank suggests that as it was properly seeking to protect its own

financial interests, this behavior was justified or privileged, and therefore could not

constitute tortious interference.

The Bank does not appear to recognize that Civic made a counterclaim with

regard to tortious interference with its prospective relationship with the City.

Nevertheless, the Bank suggests that Civic has failed to support any of its claim

with any evidence.

Civic disagrees with the Bank on all these arguments.  Civic does

acknowledge the Bank was authorized in Civic's assignment of rents to collect

rents directly from Main Street, to communicate with Main Street, and to modify

the lease.  Civic argues, however, the scope of the Bank's discussions—

particularly those for future plans not involving Civic—exceeded the Bank's

authorization.  Civic argues the Bank's unauthorized discussions were an improper

interference.  Civic claims in its briefing that it has a claim against the Bank related

to interferences with Debtor's prospective relationship with the City.

### A.   Summary Judgment

Summary judgment is governed by Rule 7056 of the Federal Rules of

Bankruptcy Procedure.  Bankruptcy Rule 7056 applies Federal Rule of Civil

Procedure 56 in adversary proceedings.  Federal Rule 56 states, in relevant part,

that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The granting of "[s]ummary judgment is proper if, after viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmovant, no genuine issues of material fact exist and the movant is entitled to judgment as a matter of law."  Hayek v. City of St. Paul, 488 F.3d 1049, 1054 (8th Cir. 2007).

The burden of showing there are no genuine issues of material fact belongs to the moving party.  Winthrop Res. Corp. v. Eaton Hydraulics, Inc., 361 F.3d 465, 468 (8th Cir. 2004).  "Once the movant has supported the motion, the non-moving party 'must affirmatively show that a material issue of fact remains in dispute and may not simply rest on the hope of discrediting the movant's evidence at trial.'"  In re Houston, 385 B.R. 268, 271 (Bankr. N.D. Iowa 2008) (quoting Barge v. Anheuser-Busch, Inc., 87 F.3d 256, 260 (8th Cir. 1996)).  "When a moving party has carried its burden under Rule 56(c), the party opposing summary judgment is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing there is a genuine issue for trial."  G.E. Capital Corp. v. Commercial Services Group, Inc., 485 F. Supp. 2d 1015, 1022 (N.D. Iowa 2007) (quotations omitted) (emphasis added).

"A 'material' fact is one 'that might affect the outcome of the suit under the governing law . . . .'" Johnson v. Crooks, 326 F.3d 995, 1005 (8th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). An issue of material fact is genuine if a reasonable fact-finder could return a verdict for the nonmoving party on the question. Anderson, 477 U.S. at 252. Evidence that raises only "some metaphysical doubt as to the material facts" does not create a genuine issue of fact. Matsushita Elec. Indus. Co. v. Zenith Radio, Corp., 475 U.S. 573, 586 (1986). "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" In re Patch, 526 F.3d 1176, 1180 (8th Cir. 2008) (quoting Matsushita, 475 U.S. at 587).

**B.    The Bank's Motion for Summary Judgment on Civic Partners' Claims for Tortious Interference**

The Bank has moved for summary judgment on Civic's entire counterclaim. Civic claims to have raised two separate claims of tortious interference. First, Civic claims the Bank tortiously interfered with Civic's existing relationship with Main Street. And Second, Civic states in briefing that it has a claim that the Bank tortiously interfered with Civic's prospective relationship with the City. The Court will address them in that order.

### 1.    Civic's Claim that the Bank Tortiously Interfered with Civic's Existing Contract with Main Street

Civic contends that the Bank improperly interfered with its existing contractual relationship with Main Street.  Civic claims the Bank engaged in secret negotiations with Main Street to sell the property to Main Street after it foreclosed on Civic.  Civic also alleges that as part of the deal the Bank intended to prevent Civic from collecting the large deficiency it was owed by Main Street.  Civic admits it supported the Bank's initial attempt to negotiate a solution in the interest of all the parties.  Civic claims, however, at some point the Bank began acting only in its own interest and attempted to cut Civic out of any existing relationship with Main Street.

The Bank moved for summary judgment arguing that it was pursing an agreement in the interest of all the parties.  The Bank also claims that to the extent it acted in its own economic interest to protect the value of its collateral, its actions were justified and cannot be the basis for liability on Civic's claim.

Intentional interference with an existing contract or relationship is normally a question of fact.  Locksley v. Anesthesiologists of Cedar Rapids, P.C., 333 N.W.2d 451, 454–55 (Iowa 1983) ("It is generally not a legal question for courts to decide, but a factual one for the jury . . . ."); see also G.E. Capital Corp., 485 F. Supp. 2d at 1027–28 (noting that "on a tortious interference claim, particularly intensive fact finding is required . . .").

9

To recover for intentional interference with an existing contract, a plaintiff must show:

> (1) plaintiff had a contract with a third-party; (2) defendant knew of the contract; (3) defendant intentionally and improperly interfered with the contract; (4) the interference caused the third-party not to perform, or made performance more burdensome or expensive; and (5) damage to the plaintiff resulted.

Kern v. Palmer Coll. of Chiropractic, 757 N.W.2d 651, 662 (Iowa 2008) (quoting

Green v. Racing Ass'n of Cent. Iowa, 713 N.W.2d 234, 243 (Iowa 2007)

(quotations omitted)). There is no dispute here about elements (1) and (2). Civic

had a contract with Main Street. The Bank knew of that contract. Elements (3)–

(5) are at issue here.

### a.    Element (3)—Improper Interference

In particular, the parties disagree about whether the Bank's actions qualify

as intentional and improper interference with Civic's lease agreement with Main

Street. In Kern, the Iowa Supreme Court stated:

> We look to the following factors in deciding whether the defendants' conduct was improper:
>
> > (a) the nature of the actor's conduct, (b) the actor's **motive**, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the **relations between the parties**.

Kern, 757 N.W.2d at 662 (quoting Hunter v. Bd. of Trs. of Broadlawns Med. Ctr.,

481 N.W.2d 510, 518 (Iowa 1992) (quoting Restatement (Second) of Torts § 767

(1981))) (emphasis added).

The Bank argues here Civic fails to show any evidence of "improper" action

and that even if Civic sufficiently raised these factual issues, the Bank's actions

were justified or privileged.  The question of whether an action is "privileged" or

"justified," however, is similar, if not identical, to whether an action is "proper"

(element (3)).  As the Restatement makes clear, these terms are interchangeable.

See Restatement (Second) of Torts § 767, cmt. b.  The Restatement adopts the

proper versus improper language in an attempt to add clarity:

> b.  Privilege to interfere, or interference not improper.  Unlike other
> intentional torts such as intentional injury to person or property, or
> defamation, this branch of tort law has not developed a crystallized set
> of definite rules as to the existence or non-existence of a privilege to
> act in the manner stated in §§ 766, 766A or 766B.  Because of this
> fact, this Section is expressed in terms of whether the interference is
> improper or not, rather than in terms of whether there was a specific
> privilege to act in the manner specified.  The issue in each case is
> whether the interference is improper or not under the circumstances;
> whether, upon a consideration of the relative significance of the
> factors involved, the conduct should be permitted without liability,
> despite its effect of harm to another.

Restatement (Second) of Torts § 767, cmt. b.

Iowa cases have continued to adopt and cite to the Restatement (Second) of

Torts in discussing tortious interference.  See Kern, 757 N.W.2d at 662; Green,

713 N.W.2d at 244; see also Nesler v. Fisher and Co., Inc., 452 N.W.2d 191 (Iowa

11

1990) (relying heavily on the Restatement §§ 766–67).  In order to find tortious

interference, Iowa courts require that the infringing party's sole or predominant

motive must have been improper.  See Berger v. Cas' Feed Store, Inc., 543 N.W.2d

597, 599–600 (Iowa 1996) (citing Restatement (Second) of Torts § 767, cmt. d.).

Justification has also been discussed as an affirmative defense.  See Locksley v.

Anesthesiologist of Cedar Rapids, P.C., 333 N.W.2d 451, 454–55 (Iowa 1983); see

also Restatement (Second) of Torts § 767, cmts. b, k.

Some of the material facts relating to element (3) are not in dispute.  The

parties agree that the Bank had discussions with Main Street in which Civic did not

participate before the foreclosure action was actually filed.  The parties also seem

to agree that the Bank was in discussions about a post-foreclosure deal with Main

Street.  They seem to acknowledge that the foreclosure was a part of any

contemplated deal between the Bank and Main Street.

The parties disagree, however, about the motivations of the Bank in sending

messages to Main Street.  The parties disagree whether those messages were meant

to exclude and mislead Civic Partners.  The Bank argues "a party does not

improperly interfere with another's contract by exercising its own legal rights in

protection of its own financial interests."  Gen. Elec. Capital Corp. v. Commercial

Servs. Group, Inc., 485 F. Supp. 2d 1015, 1027 (N.D. Iowa 2007).  The Bank

argues it was merely exercising its rights to protect its interests.

12

Certainly, the Bank had a right to foreclose.  Any damages due solely to

foreclosure would be merely "incidental to the pursuit of [the Bank's] own ends by

proper means."  Preferred Mkt. Assocs. Co. v. Hawkeye Nat. Life Ins. Co., 452

N.W.2d 389, 396 (Iowa 1990).  Thus, the foreclosure alone could not be the basis

of a claim for tortious interference.  The question is whether the Bank's conduct

and communications with Main Street were similarly justified/privileged?  Put

differently, was it proper for the Bank to begin discussions with Main Street prior

to foreclosure, even if those discussions were in the Bank's economic interest?

The Bank argues Civic has no evidence the Bank was motivated to harm

Civic.  Civic argues that the evidence suggests the Bank was conspiring with Main

Street to reach a deal which did not involve Civic—and thus to intentionally harm

Civic.  In particular, Civic cites to a specific email the Bank sent out after the City

failed to approve the mediation agreement:

> FNB sent the same email [regarding the City's decision] to each of CP
> and Main Street with one huge difference — in the email to Main
> Street, FNB assured Main Street, 'Rest assured that First National
> Bank honors its obligations.  We are committed to work with you
> while the foreclosure is pending and after it is completed.'

(Civic Partners Resistance, ECF Doc. No. 66, p. 6, Ex. 7.) (emphasis original)

Civic claims the email shows that the Bank viewed itself as "obligated" to a deal it

had already negotiated with Main Street and/or that it was still in the process of

"working with" Main Street to negotiate a deal.  This email is dated December 10,

2009 nearly a year before the Bank actually filed for foreclosure on December 7, 2010. Civic also cites additional evidence of "meetings, telephone calls and correspondence" between the City, the Bank, and Main Street to which Civic was not privy. (Civic Partners Resistance, ECF Doc. No. 66, p. 7–8.) Civic believes this is further proof of the Bank's intent to cut Civic out of any remaining rights.

Civic also asserts the Bank's motivations to harm Civic were revealed in how the deal between the Bank and Main Street ultimately would play out. Civic points out that the deal made no provision at all for Civic to recover any of the back-rent Civic claims Main Street still owed. In fact, Civic suggests the deal the Bank proposed sought to protect Main Street from Civic's back-rent claims—but still allowed the Bank to collect deficiencies from Civic on its note to the Bank.

The Bank argues that Civic mischaracterizes the motive questions by reading something into the facts that is not there. The Bank also claims it acted properly to have a backup plan ready in case the mediation failed. Viewing the evidence in the light most favorable to Civic, the nonmoving party, there is at least a factual question about the Bank's motivations in its negotiations with Main Street.

The Bank argues that, even if Civic's version and interpretation of the facts is accepted for summary judgment purposes, the assignment of rents Civic gave to the Bank, provided the Bank with broad authorization—thus giving justification or

14

privilege to act.  (FNB Brief, ECF Doc. No. 48-2, p. 11.)  For instance, the

assignment of rents authorizes the Bank "to modify the terms of any of the Leases

and to surrender or terminate the Leases upon such terms as Lender may

determine."  (FNB Brief, ECF Doc. No. 48-2, p. 11.)  Before the foreclosure, the

Bank points out it had established a legitimate relationship with Main Street under

the assignment of rents.  The Bank claims it was authorized to interact with Main

Street for all purposes related to the assignment of the lease and the modification

of the lease.

The Bank was authorized by the assignment of rents to communicate with

Main Street.  In particular, the Bank argues that because Civic had entered an

assignment of rents, and the Bank was receiving rent directly from Main Street,

that "the business relationship between Civic and Main Street required the Bank's

legitimate and legally authorized oversight, consent and involvement."  (FNB

Brief, ECF Doc. No. 48-2, p. 12.)  Certainly the Bank was authorized to some

extent to be involved in the relationship and in communication with Main Street

for purposes related to the Lease.  However, it is not clear that this authorization

extended to negotiating a different arrangement with Main Street which did not or

would not involve Civic.

The scope of the Bank's privilege/justification—i.e. what is proper

conduct—may depend on the status of the existing relationship between the parties

15

and/or the history of their relationship.  See Kern, 757 N.W.2d at 662 (one of the

factors to determine whether the conduct is improper: "(g) relationship of the

parties").  For instance, in the case of Burke v. Hawkeye Nat. Life Ins. Co., 474

N.W.2d 110 (Iowa 1991), the Iowa Supreme Court affirmed a jury verdict finding

intentional interference.  In Burke, an independent insurance agent sued an

insurance company for intentionally interfering with his contract renewals.  Burke

alleged that before the termination of his relationship with the defendant insurance

company, that company had already begun directing other sales persons to target

Burke's long time customers and thus deprive Burke of his policy renewal fees.

     In affirming the jury's verdict in Burke, the Iowa Supreme Court

distinguished an extremely similar case from a year earlier:  Preferred Marketing

Associates Co. v. Hawkeye Nat. Life Ins. Co., 452 N.W.2d 389 (Iowa 1990).  In

the earlier case, the court reversed a jury verdict for a plaintiff and ruled there was

insufficient evidence to support intentional interference.  In Burke, the court noted

that "the interference took place prior to Burke's termination as an agent, not

following the termination as in Preferred Marketing."  Burke, 474 N.W.2d at 115

(emphasis original).

     In this case, there is a factual issue about whether the relationship between

the Bank and Civic was "terminated" when the Bank began its solicitation of Main

Street.  If the relationship had not been terminated, it might affect the analysis of

16

what is proper action or in the zone of privilege.  For example, the zone of

privilege for the Bank may be narrower than if the parties had no existing

relationship.  While "the relations between the parties" is just one of the factors

courts look to in determining what is proper, it is clearly an important factor.

Kern, 757 N.W.2d at 662

Another case that deals with the effect of the parties' relationships on the

proper/privilege analysis is National Hygienics, Inc. v. S. Farm Bureau Life Ins.

Co., 707 F.2d 183 (5th Cir. 1983).[2]  National Hygienics, like this case, involved a

tortious interference claim in the context of a three-party relationship between a

landlord, tenant, and the landlord's lender.  In National Hygienics, after the

landlord-tenant relationship broke down, the tenant and the lender reached an

agreement whereby the lender foreclosed on the landlord and sold the building to

the tenant.  The landlord brought a claim of intentional interference with an

existing contract against the tenant and lender.

The lower court granted summary judgment for the tenant and lender on the

landlord's claim for intentional interference with an existing contract.  The Fifth

Circuit reversed.  The Fifth Circuit found that it was possible that under the

---

[2] While it is not an Iowa case, the law is similarly based on the black letter law of torts.  See
National Hygienics, 707 F.2d at 188 (citing Irby v. Citizens National Bank of Meridian, 121
So.2d 118, 119 (Miss. 1960) (citing 30 Am. Jur. Interference, §§ 43–53, 55)).  The Mississippi
case law relies on the publication American Jurisprudence which itself summarizes the national
case law and cites repeatedly to the Restatement (Second) of Torts.  See, e.g., 44B Am. Jur. 2d
Interference § 39 (West 2012) (citing Restatement (Second) of Torts § 766A).

existing factual record the tenant and the lender "were motivated by a malicious

desire to rid themselves of [the landlord] . . . ." Id. at 188.  The court noted:

> Given the backdrop of ill will between Bell and the members of
> Coastal, the assertion that Coastal used Bell's letter as a pretense to
> accomplish its legally unjustifiable long-desired goal of getting rid of
> Bobby Bell is not implausible. That plausibility is reinforced by the
> fact that Central and Southern acted almost immediately after the
> meeting to exercise their assignment of the lease and by the fact that
> in the end the building was foreclosed and purchased by Southern and
> Central and then sold to Coastal's successor.

Id. at 189.  The Court concluded that if the parties were motivated by such a desire,

then the parties' actions "were outside Mississippi's zone of privilege."  Id.

Because there was a genuine issue of material fact—based in part on the history of

the relationships—about the motivations of the parties, summary judgment was

inappropriate.  Id.

The facts in National Hygienics are similar to this case.  Civic suggests that

its lender, the Bank, improperly interfered with Civic's tenant relationship.  There,

like here, there is arguably a "backdrop of ill will" between the parties.  As in

National Hygienics, if on the whole of the record the Bank was plausibly

motivated by an improper desire to rid itself of Civic or had other ill will toward

Civic then its negotiations with Main Street may have been improper and therefore

outside the Iowa zone of privilege.  The Court finds that on the whole of the

record—including the apparent history of ill will between the parties—there is a

18

genuine dispute as to the motivations of the Bank during its discussions with Main

Street.  Summary judgment is therefore inappropriate on this element of this claim.

While National Hygienics noted the possibility of malicious conduct and ill

will, those motivations are not required elements of the tort, but only evidence of

the improper purpose.  The Iowa Supreme Court has specifically stated that malice

is not required; instead, only a showing of improper purpose is required.  Hunter,

481 N.W.2d at 518 (quoting Restatement (Second) of Torts § 767 (1981)).  The

Restatement explains a showing of malice or ill will is not generally required:

> r.  Ill will.  Ill will on the part of the actor toward the person harmed
> is not an essential condition of liability under the rule stated in this
> Section.  He may be liable even when he acts with no desire to harm
> the other.  But the freedom to act in the manner stated in this Section
> may depend in large measure on the purposes of his conduct.  Although
> the actor is acting for the purpose of advancing an interest
> of his own, that interest may not be of sufficient importance to make
> his interference one that is not improper and avoid liability.
> Satisfying one's spite or ill will is not an adequate basis to justify an
> interference and keep it from being improper.  The presence or
> absence of ill will toward the person harmed may clarify the purposes
> of the actor's conduct and may be, accordingly, an important factor in
> determining whether the interference was improper.
>
> s.  "Malice."  There are frequent expressions in judicial opinions that
> "malice" is requisite for liability in the cases treated in this Section.
> But the context and the course of the decisions make it clear that what
> is meant is not malice in the sense of ill will but merely "intentional
> interference without justification."  Malicious conduct may be an
> obvious type of this interference, but it is only one of several types.
> Compare Introductory Note to Chapter 29 (Wrongful Prosecution of
> Criminal Proceedings).  If the plaintiff is required to show malicious
> interference in this latter sense, however, it is sometimes held to

impose upon him the burden of alleging and proving "lack of justification." (See § 767, Comment k).

Restatement (Second) of Torts § 766, cmts. r and s.  So to be clear, Civic need not show actual malice or ill will to prevail.  It needs to show only interference without justification.  Malice and/or ill will can be relevant to making that showing.

As noted, giving Civic the benefit of all reasonable factual inferences, Civic has raised a genuine issue of material fact about whether the Bank acted improperly and/or without justification.  The Bank has powerfully asserted its motive was to protect itself after years of missed payments and unfulfilled promises from Civic.  The Bank was certainly entitled to pursue a backup plan if the mediation agreement was not ratified by the City.  While there is great appeal in much of what the Bank argues, it does not mean there are no issues of fact for trial on the issues stated above.  This conclusion is bolstered by <u>National Hygienic</u> where the court pointed out that the whole context, including the history of ill will between the parties, can at least raise factual issues for trial regarding improper motive.  Given the whole history, the Court finds there are genuine issues of material fact about the Bank's motivation.  Therefore, summary judgment is inappropriate.

Civic also claims that the Bank's failure to consent to the termination of the amended lease agreement with Main Street was improper.  However, because the

20

Court has already found summary judgment is inappropriate on the element of

improper interference, the Court need not reach this additional claim at this time.

### b.    Element (4)—Whether the Bank's Interference "Caused" Main Street Not to Perform

While the parties spent most of their arguments on "motive," they did make

arguments on elements (4) and (5).  The Bank argues that Main Street's decision

not to pay back-rent under the original lease or negotiate a different rent than that

in the amended lease was not caused (element (4)) by the Bank.  The Bank notes

there are several reasons Main Street did not negotiate further or seek to pay its

deficiency under the original lease.  The first is that Main Street did not believe the

lease was terminated and believed it had no obligation to continue negotiations

with Civic on the original lease because Main Street believed the amended lease

controlled.

Second, the Bank also argues Main Street had insufficient cash flow to pay

the rent due under the original agreement (even if the original contract was

reinstated) and never had the ability to do so.  The Bank thus contends Main

Street's disputes with Civic as well Main Street's actual inability to pay—not the

Bank's interference—caused Main Street to have no interest in pursuing further

negotiation with Civic under the original lease.  Finally, even under a reinstated

original lease, Main Street was withholding rent over disputes with Civic regarding

repair and maintenance to the premises.  Simply put, the Bank's interference did

not cause the loss of payment.

Civic responds by pointing out that the financial information from Main

Street and its owner and guarantor, William Barstow, shows Main Street did have

the ability to pay back-rent.  At a minimum, Civic argues this raises an issue of fact

about whether inability to pay—was the "cause" for failure of Main Street to

continue to work with Civic.  Civic also has argued throughout the proceedings on

the questions of which lease governs—the original lease or amended lease—that

the Bank's alleged tortious conduct was intimately involved with Main Street's

belief that the amended lease controlled.  Civic points out the Bank refused to

consent to termination—which Civic claims is also tortious conduct—because it

already had a deal with Main Street that cut Civic out.

Civic has asserted Main Street's allegedly improper deal with the Bank

caused Main Street to believe it could safely assert it had no continuing obligation

to pay.  Civic argues that if the Bank had not engaged in its improper interference,

then Main Street would have been forced to deal with Civic.  Civic would have

then been able to negotiate with Main Street and would have been paid some

amount of rent and possibly even received some payment of back-rent.  Civic

points to the fact, that as part of the negotiations with the Bank, the Bank promised

Main Street it would not have to pay the large deficiency it owed Civic, and that

the Bank would defend Main Street from Civic's claims.  Civic points out the Bank

also offered to finance Main Street's purchase of the building with lower payments

than those due under Main Street's lease with Civic.  Civic claims the Bank was

essentially undermining its ability to collect rent and/or be paid on the deficiency

on all fronts.  Had the Bank not been negotiating, Civic claims it would have been

able to receive at least some of this deficiency and perhaps would have been paid

some additional ongoing monthly rent. Thus, Civic claims the Bank's interference

was the cause of Main Street's failure to pay rent, even if the Bank's interference

was not the cause of Main Street's initial withholding.

The Court finds there are genuine issues of material fact on the issue of

causation—element (4).  To date much of the evidence in front of the Court before

summary judgment appeared to show Main Street's inability to pay under the

original lease was undisputed.  The summary judgment resistance by Civic,

however, sufficiently raised a factual issue on this question.  Moreover, Civic has

consistently argued—and attempted to submit evidence at earlier hearings—that

Main Street and the Bank conspired to prevent Civic from reinstating the original

lease.  While much of what Civic presents as "evidence" of the Bank's role as a

"cause" of Civic being unable to collect back rents borders on speculation

insufficient to defend summary judgment, the Court will give Civic the broadest

possible benefit of the inferences that could be drawn from the actual evidence.

The Court finds this issue is tied up in the same facts as the motive analysis and finds the same issues of material fact for the same reason.  The Court again reiterates that summary judgment is not a time to weigh the evidence, but just to determine if there is enough for a trial.

### c.    Element (5)—Damage to the Plaintiff Resulted

The Bank's arguments in favor of summary judgment also suggest Civic had no damages resulting from any interference.  The arguments are essentially the same as those on causation.  The Bank has argued that Main Street could never pay under the original lease.  Thus, the Bank argues that even if Civic's assertion that the Bank interfered with Civic's ability to pursue payments or negotiate is true, there are no damages.  Civic asserts evidence about the financial ability to pay of both Main Street and Mr. Barstow, Main Street's principal.  As discussed above, this evidence provides support for its claim for damages.  The Court finds there is a genuine issue of material fact on the question of damages.

Civic has also alleged that it may be entitled to punitive damages.  The Bank has stated that there is no evidence that supports punitive damages.  The parties agree that Iowa law on punitive damages is clear.  "Punitive damages may be awarded for the tort of intentional interference with a business relationship, if the tort is committed with legal malice."  Westway Trading Corp. v. River Terminal Corp., 314 N.W.2d 398, 404 (Iowa 1992) (citing Pogge v. Fullerton Lumber Co.,

24

277 N.W.2d 916, 920 (Iowa 1979); Team Central, Inc. v. Teamco, Inc., 271

N.W.2d 914, 923–26 (Iowa 1978)).  "[L]egal malice . . . may be established by

showing wrongful or illegal conduct committed or continued with a willful or

reckless disregard of another's rights."  Pogge, 277 N.W.2d at 920 (citation

omitted).  While legal malice is not required to prove tortious interference, legal

malice must be shown in order to prove punitive damages.  Giving Civic the

benefit of all inferences, the Court finds that on the whole of the record—including

the apparent history of ill will between the parties—there is a genuine issue as to

whether the alleged interference was with malice.

The Court finds there are no genuine issues of fact with regard to elements

(1) and (2).  The parties agree that Civic had a contract with Main Street, and the

Bank knew of that contract.  However, under a broad application of the summary

judgment rule giving Civic the benefit of all the inferences from the evidence, the

Court concludes there are genuine issues of material fact with regard to elements

(3)–(5).

### 2.    Civic Partners' Claim for Tortious Interference with Its Business Expectancy or Prospective Relationship with the City of Sioux City

Civic suggests that it raised a separate or additional counterclaim regarding

the Bank's interference with a prospective business relationship with the City.

Civic suggests that the Bank failed to properly move for summary judgment on this

part of its counterclaim.  While the Bank attempts to address this assertion in its

25

Reply, the Court finds—contrary to Civic's assertions—that no such counterclaim

has been made.  Nevertheless, the Court will address it because the parties have

discussed it in briefing.

The claim for the tortious interference with a prospective relationship has

generally the same five elements as interference with an existing contract.

> The elements of the tort of interference with a prospective business
> advantage or contractual relationship . . . are the following: (1) the
> plaintiff had a prospective contractual or business relationship; (2) the
> defendant knew of the prospective relationship; (3) the defendant
> intentionally and improperly interfered with the relationship; (4) the
> defendant's interference caused the relationship to fail to materialize;
> and (5) the amount of resulting damages.

G.E. Capital Corp., 485 F. Supp. 2d at 1025 (citations omitted).

However, the degree of "'impropriety' or 'wrongfulness' of conduct alleged

to be tortious interference is determined according to somewhat different

standards, depending upon whether the claim is for . . . an existing contract . . . or

potential contract or business relationship." Id. at 1026.  "[T]o recover for

interference with prospective business relations, a plaintiff must prove the

defendant acted with the sole or predominant purpose to injure or financially

destroy the plaintiff."  Compiano v. Hawkeye Bank & Trust of Des Moines, 588

N.W.2d 462, 464 (Iowa 1999) (citations omitted) (emphasis original).  This is "a

much more specific showing" which really creates a "higher burden."  G.E. Capital

Corp., 485 F. Supp. 2d at 1027.  The analysis of this claim is otherwise the same as the analysis above.

Civic alleges that in order for the Bank to achieve its deal with Main Street, the Bank had to get the City "on board" with its plan.  (Civic Partners Resistance, ECF Doc. No. 66, p. 17.)  Civic claims the Bank interfered with Civic's business expectancy by discouraging the City from participating in the discussions with Civic and the other parties.  Civic claims the Bank also improperly interfered with the City's approval of the mediation agreement.

Even assuming such a separate claim was made, and even giving Civic the benefit of all reasonable factual inferences on this claim, the Bank correctly points out no evidence has been offered to support a claim of interference with regard to any of the five elements.  Most clearly, Civic has failed with respect to element (3) to meet the higher burden to show that the Bank had the intent to injure or financially destroy Civic.  There is a large difference between acting with an improper motivation or some general ill will in which one party might wish to no longer deal with a second party and actually having the intent to harm.  At the very least, because there is no genuine issue of material fact as to the element of intent to injure or destroy, the Bank is entitled to summary judgment on this claim.

**IT IS HEREBY ORDERED** that First National Bank's Motion for Summary Judgment as to Civic's counterclaim is **DENIED**, in part and

**GRANTED** in part.  The Motion is denied on Civic's counterclaim alleging the

Bank tortiously interfered with Civic's existing contract with Main Street.  The

Motion is granted on Civic's purported counterclaim alleging the Bank tortiously

interfered with Civic's prospective contractual relationship with the City.

Dated and Entered: January 3, 2013

_____

**THAD J. COLLINS, JUDGE**
**UNITED STATES BANKRUPTCY COURT**